IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BARRY SULLIVAN, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C. A. No. 09-170-MPT |
| | : | |
| NATIONWIDE LIFE INSURANCE | : | |
| COMPANY OF AMERICA, a corporation, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM ORDER**

## I. INTRODUCTION

This is an employment discrimination case.  Plaintiff Barry Sullivan ("plaintiff" or

"Sullivan") commenced this suit against his former employer, Nationwide Life Insurance

Company of America ("defendant" or "Nationwide") asserting discrimination, in regards

to the termination of his employment, on the basis of race in violation of Title VII of the

Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and 42 U.S.C. § 1981

("§ 1981"); on the basis of retaliation in violation of Title VII and § 1981; and breach of

the covenant of good faith and fair dealing.[1]  Currently before the court is defendant's

motion for summary judgment.[2]

## II. BACKGROUND[3]

Nationwide or its predecessor in interest (Provident Mutual) employed plaintiff, an

---

[1] D.I. 1 ("Complaint").
[2] D.I. 38.
[3] Throughout this document, this court has adopted without attribution language suggested by either side in the dispute.  In all such instances, the language in question has become that of this court, based upon review of the evidence and the law.  Unless otherwise noted, these facts take as true all allegations of the non-movant that conflict with those of the movant and resolve all doubts against the movant.

African-American, from 1988 until his termination on March 28, 2007.[4]  Plaintiff began

working for Provident Mutual in 1988 as a lead programmer analyst, remained in

information technology ("IT") positions, and had substantially similar duties from

Nationwide's acquisition of Provident Mutual in October 2002 until his termination in

2007.[5]  During the course of his employment, plaintiff worked under several managers

prior to Kenneth Olsen becoming his manager in December 2004.[6]  In January 1999,

one of these prior supervisors, Susan Hearn, completed an IT Employee Assessment

on Sullivan.  She rated his overall performance as "Occasionally Meets Expectations"[7]

and noted:

> Barry needs to work on improving his communication skills. He is not
> direct in his discussion of issues and the status of tasks.  He is reluctant to
> admit mistakes, and does not bring management into the discussion and
> resolution of issues and problems. He does not readily share information,
> and, when probed, often seems to talk 'around' an issue so as to lose
> sight of the original question.  Additionally, he needs to focus on
> developing a more organized approach to his work.[8]

Subsequent evaluations by Hearn were generally positive and Sullivan's overall

evaluation was that he "Meets Expectations," though his communications skills

continued to be criticized.[9]  Sullivan's 2003 and 2004 performance reviews by a

---

[4] D.I. 42 at B-10, D.I. 40, Ex. X at ¶ 9.

[5] D.I. 42 at B-11, B-12, B-13.

[6] *Id.* at B-11, B-12, B-17, B-19, B-53.

[7] The evaluation form concludes with an overall evaluation of employee performance on a 1 through 5 scale; with 1 meaning the employee "Substantially exceeds expectations" and 5 meaning the employee "Fails to meet expectations."  Sullivan's rating, "Occasionally meets expectations," is described as "Performance that occasionally meets, but sometimes falls below, the supervisor's expectations for job competence.  Generally does not attain normal standards.  Improvement needed."  D.I. 40, Ex. C.

[8] *Id.*, Ex. C.

[9] *See* D.I. 42 at B-67-B-73 (January 18, 2000 review).  Sullivan's overall evaluation for his 2000 review noted that he "Meets Expectations."  For the "major duties and responsibilities" category of "Good communication skills with all levels of management," and the "competency assessment" categories of "leadership skills," and "communications skills,"  he was rated as "Occasionally Meets Expectations."  With regard to "leadership skills," it was noted that "Barry's users rely on him to provide direction in all phases of

subsequent manager, Robert J. Alessandrine, were also positive and showed Sullivan met or exceeded performance criteria.[10]  During his employment, Sullivan did not feel like he was subjected to race discrimination by any of his earlier managers, or anyone else, at Nationwide.[11]

Olsen became Sullivan's manager in late 2004, following the resignation of another manager.[12]  For the first year Olsen was the head of the team of programers in

---

RPS support, and he functions well in this respect.  However, his style of interaction with others impacts his ability to be truly successful in this area."  With regard to "communication skills," it was noted that "Barry's written communication skills are good, and he communicates well with his users.  He responds to their inquiries in a timely and complete manner.  His oral communication style in which he relays more and often irrelevant information than is necessary can lead to confusion and frustration on the part of the listener."  He was rated as "Exceeding Expectations" for the "competency assessment" categories of "technical skills," "goal orientation," and "customer focus."  For each of the other "major duties and responsibilities" categories ("Design, development and implementations of system modifications and enhancements," "Smooth operation of production systems," and "Provide technical support and guidance to team members"), and "competency assessment" categories of "business knowledge," "problem solving," "command skills," "time management," "team orientation," "innovation," and "integrity," Sullivan was rated as "meets expectations."

    *Id.* at B-74-B-82 (January 23, 2002 review).  In Hearn's 2002 evaluation of Sullivan's overall performance, she checked the box "Meets Expectations," but included a minus sign ("-") next to that selection box indicating an overall rating slightly less than meeting expectations.  *See id.* at B-81.  For the "major duties and responsibilities" category of "Good communication skills with all levels of management," and the "competency assessment" categories of "communications skills" and "Command skills," he was rated as "Occasionally Meets Expectations."  With regard to "communication skills" it was noted that "Barry's written communication skills are good.  When pressed, he will produce written project documentation that is thorough and well organized.  He needs to continue to work on verbally communicating in a clear and concise manner.  He needs to focus on good listening skills - making sure that he has understood a question and is providing the appropriate and concise response.  Barry has a tendency to embellish a conversation with irrelevant and sometimes confusing information.  This leaves others with the impression that he does not have a clear understanding of the issues being discussed.  He also has a tendency, when he is not sure of the accurate response, to 'talk around' the problem, as opposed to admitting that he needs to do additional research in order to come up with the right answer."  With regard to "command skills" it was noted that "Barry has no problem making decisions.  His knowledge of RPS and his technical knowledge enable him to make solid decisions in support of RPS and VAL.  Barry needs to continue to focus on assuring that both IT management and his business partner's management are included in the decision making process and that these decisions are well documented."  He was rated as "meets expectations" on each of the other "major duties and responsibilities," and "competency assessment" categories.

    [10] *Id.* at B-83-B-91 (2003 performance review); *id.* 42 at B-92-101 (2004 performance review).  The 2003 and 2004 evaluations were in a slightly different format than those completed by Hearn, but included written comments indicating Sullivan was meeting or exceeding his performance criteria.

    [11] *See id.* at B-15 (Sullivan deposition).

    [12] *Id.* at B-21.

which plaintiff worked, there were no issues between Sullivan and Olsen.  Sullivan

described their working relationship as "pleasant."[13]  Also, Sullivan's 2005 performance

review, prepared by Olsen, reported that Sullivan was achieving his performance

criteria.[14]  Among the comments made by Olsen in that review were:

> Barry's primary focus is on the support of the IMAC Traditional Life
> system.  Barry worked closely with a contractor this year and helped guide
> an initiative to identify areas of the system that may need attention.  He
> maintains his tasks with up to date status and information in the EPA
> Database.  All changes are migrated to production in accordance with
> documented procedures or at the direction of his manager.
>
> * * *
>
> Barry continues to be an extremely diligent worker, working long hours to
> ensure that any tasks that he is involved in are done to the highest quality.
> Barry never hesitates to volunteer to help out either another associate or
> with additional testing.  We must continue to find ways to assist him with
> his current responsibilities so that we may take better advantage of his
> skills.[15]

An incident in April 2006, however, seems to have changed the relationship

between Olsen and Sullivan.  On Thursday, April 6, 2006, Sullivan was assigned to deal

with a critical error in IMAC, a software system for which he was responsible.[16]  The

error caused the IMAC system to be unable to pay valid death benefit claims for its

policyholders.[17]  Sullivan acknowledged that this was a major problem for a life

insurance company.[18]  Sullivan did not confirm that the error had been corrected until

---

[13] *Id.* at B-22.
[14] *Id.* at B-102-B-113.
[15] *Id.* at B-105, B-113.
[16] D.I. 40, Ex. E.
[17] *Id.*, Ex. E.

[18] D.I. 42 at B-28  ("Q.  Would you regard a failure of a system to be able to pay death claims a serious problem for a life insurance company?  A.  I think it's a serious problem for any company not to pay death claims or any other function that's in a system that's a non-functional system to work in this manner.  Q.  So the answer is yes, you would view this as a serious problem?  A.  I say yes, this is a serious problem.").

4

the morning of Friday, April 14, 2006.[19]  Olsen's written summary of this incident

indicates that Sullivan's communications during his attempt to correct the error were

vague and confusing.[20]

Olsen testified that, following the incident, he determined that Sullivan required

informal coaching to improve his job performance:

> This was the trigger event, because it was highly visible.  It impacted our
> business users.  It was reported to my manager and my manager's
> management.  They had a dissatisfaction with the length of time that, as a
> manager, I felt it necessary that we really start–I really needed to start
> taking steps to get Barry's performance–to improve Barry's performance.[21]

Consequently, Olsen informed his supervisor, Rachel Gilmore, of his concerns

regarding Sullivan's performance and his plan to provide Sullivan with informal

coaching.[22]  Over the next few months, Olsen met with Sullivan one-on-one on a weekly

basis during which Olsen would review Sullivan's status reports and review "plans to

work on over the next few days, any obstacles in his way, how much time he may be

spending on particular tasks, help him identify and set priorities."[23]  During that time

period, Olsen also kept his supervisor, Gilmore, up to date on how Sullivan was

performing during his regular weekly meetings with Gilmore.[24]  As reflected in his

---

[19] D.I. 40, Ex. E.

[20] *Id.*, Ex. E.

[21] *Id.*, Ex. B at 75 (Olsen Deposition).

[22] *Id.*, Ex. B at 77 ("Q.  And what was your discussion with Rachel Gilmore?  A.  At that time [Gilmore] was unhappy about this whole event that had taken place with the disruption of service and the complaints she had gotten involved in doing, because people were complaining directly to her.  I told her I felt at that time that I wanted to do unofficially a little closer coaching and feedback with Barry, maybe meet – not maybe, but meet more often with him one on one, request more frequent status updates from him, try to track exactly what he was working on and what he was doing.  Q.  And what was her response?  A.  She was fine with it.").

[23] *Id.*, Ex. B at 80.

[24] *Id.*, Ex. B at 100-01 ("Over time I kept [Gilmore] abreast as we were going along . . . .  I told her I didn't think it was going well.  I told her I thought we would have to go–take more official action.  Barry, his performance, all the issues that I had outlined in any communications just did not seem to be working.  I

August 2006 performance review of Sullivan, Olsen concluded that plaintiff had not significantly improved his performance, despite his informal coaching.[25]  Therefore, in consultation with Gilmore and Human Resources Representative Charity Hughes (who is African-American), Olsen implemented a formal coaching plan.[26]

The reasons for the formal coaching plan, key points to be addressed, and scheduling of coaching sessions was set forth in an August 31, 2006 Performance/Attendance Coaching report.  In that report, Olsen stated Sullivan was "not meeting the Achieves Criteria for six (6) of his seven (7) 2006 Performance Objectives. The purpose of this coaching discussion is to stop this trend and turn around to an acceptable performance."[27]  The report listed the following key points to be covered during the coaching sessions:  increasing system knowledge; time management; innovation; initiative; documentation; and reporting/communication.  Olsen and Sullivan were to meet weekly for one-on-one coaching sessions which were to last at least an hour.  Sullivan's performance was to "be measured by a demonstrated improvement in each of the [key] areas" and the report explained how that improvement would be

---

was not confident in his performance.").

[25] *Id.*, Ex. F (2006 performance review) (concluding that "Overall, Barry is not meeting the criteria for the majority of his 2006 Objectives" and recommending that "Barry be placed on the HR Performance/Attendance Coaching Plan . . . .  If, following the completion of that plan, performance is not trending to an Achieves Criteria for his Objectives, I recommend that he be placed on the HR Performance Improvement Plan."); D.I. 42 at B-59 (Olsen testifying that the informal coaching sessions "did not seem to be helping.  They were not having the desired results that I wanted . . . .  Because I don't think Barry – Barry never displayed the knowledge of his systems and technical skills to be able to improve to a point that we desired.").

[26] D.I. 40, Ex. G (e-mails among Olsen, Hughes, and Gilmore concerning Sullivan's formal coaching).  Olsen testified that, based on his discussions concerning the informal coaching, Gilmore agreed that more formal action might be needed.  Olsen and Gilmore met with Hughes who stated that Nationwide's policy was to have an employee receive official coaching and feedback for a period of time before putting an employee on a Performance Improvement Plan.  *Id.*, Ex. B at 101-02.

[27] *Id.*, Ex. H (Performance/Attendance Coaching report for Sullivan).

6

measured.[28]  Formal coaching sessions took place from September until late December

2006, during which time Olsen continued to keep his supervisor, Gilmore, apprised as to

Sullivan's performance as he had during the informal coaching period.[29]  After the

coaching sessions, Olsen communicated with Sullivan via email to follow up on the

session and outline the expectations agreed upon at the session.[30]  Olsen testified that

once the formal coaching process started, Sullivan began to complete assigned tasks

and targets in a reasonable amount of time but that doing so required that he work late

and on weekends.  That concerned Olsen because he believed those tasks should not

require extra hours to complete, and that those extra hours effected Olsen's budget due

to the manner in which his team's time was charged internally in the company.[31]  Olsen

also was dissatisfied with the overall progress Sullivan was making, despite the formal

coaching.  In an email dated October 6, 2006, Olsen wrote:

> My goal during our one on one discussions and the assignment of the
> variety of tasks is to help you to continue to improve in the key areas of:
>
> Demonstrating System knowledge
> Time Management/Multi-tasking
> Innovation
> Initiative
> Documentation
> Reporting/Communication

---

[28] D.I. 40, Ex. H; *see also* D.I. 42 at B-61 (Olsen testifying that during the formal coaching period
he continued to meet one-on-one with Sullivan at least weekly).

[29] D.I. 42 at B-61, B-64.

[30] *See* D.I. 40, Exs. I, J; D.I. 42 at B-128-B-130 (emails from Olsen to Sullivan dated 09/07/2006,
09/28/2006, and 10/06/2006, respectively).

[31] D.I. 42 at B-61-B-62; *see also id.* at B-128 (October 6, 2006 email noting Olsen's concern that
Sullivan had to work late hours and on weekends to complete tasks and targets in a reasonable amount of
time and reciting that Olsen did not "believe that any of these tasks were particularly difficult or intensive
and were assigned while keeping the rest of your responsibilities in mind.  This workload, for someone at
your level and with a good knowledge of the system that they support, should have been able to be
accomplished within normal working hours.").

It is my feeling that our efforts should be continued or taken to the next level so that improvement may be achieved and demonstrated in all these areas.  At this time, it is my observation, that such improvement has not been demonstrated.[32]

In late 2006 or early 2007, Olsen was of the opinion that Sullivan's performance remained inadequate and Sullivan should be put on an official performance improvement plan.[33]  After relaying this conclusion to Gilmore, who agreed with Olsen's recommendation, Olsen drafted a performance improvement plan ("PIP").[34]

The PIP recited Sullivan's performance issues that were unacceptable, including: lack of demonstrated system/IT process knowledge; excessive time/costs spent on operational support; lack of implemented or presented improvements/enhancements; unable to effectively manage time and priorities and lack of necessary technical skills; and continued lack of effective communication.  The PIP included an explanation of why Sullivan's performance was deemed inadequate with respect to each of those issues. The PIP listed performance expectations during the improvement period and scheduled progress review meetings every two weeks between Olsen and Sullivan.  The PIP was dated January 17, 2007 and was to be in effect until March 17, 2007.  It warned that "[i]t is expected that you make on-going and consistent improvement in the areas outlined in this memo to meet the required level of performance for your position.  Failure to make

---

[32] *Id.* at B-129.

[33] *Id.* at B-64 ("Over time I repeated the same concerns [to Gilmore] . . . that [the formal coaching] did not seem to be having the effect that we were desiring, which was to increase Barry's performance and make him a much more valued member of our team and that I had concerns that he was not meeting the stated objectives, the yearly objectives, and it might suffer on his year-end review.  And I thought after a period of time that we needed to go to the next step of the actual documented performance improvement plan.").

[34] D.I. 42 at B-64; D.I. 40, Ex. M (Performance Improvement Plan).  Olsen testified that it was his recommendation and decision to put Sullivan on a PIP, but that "[i]f my supervisor disagreed with me, I don't think it would have happened."  D.I. 42 at B-64.

ongoing and consistent improvement during Performance Improvement may result in early termination."[35]

On or about January 17, 2007, Olsen and Hughes met with Sullivan to inform him he was being placed on the PIP (the "PIP meeting").[36]  According to Olsen, when informed he was being placed on the PIP, Sullivan became irate and disputed the negative descriptions of his performance contained in the PIP report.[37]  During that meeting, Sullivan accused Olsen, for the first time, of constantly screaming at and berating him in front of others despite Sullivan asking him to stop, accusations that Olsen denied.[38]  As a result of Sullivan's accusations, Hughes immediately began investigating Sullivan's allegations.

On January 18, 2007, Hughes sent an email to Sullivan stating she began her investigation of the alleged incidents of Olsen yelling at Sullivan.  According to that email, Sullivan did not want to provide the names of fellow employees who may have witnessed the purported incidents.  To aid her investigation, however, Hughes asked Sullivan to provide her with the dates, context, duration, and resolution of the incidents. She also asked if there was any reason why Sullivan had not brought the incidents to the attention of management or HR prior to the PIP meeting.  She also stated that Sullivan should feel free to call her if he had any questions.[39]  Sullivan responded the

---

[35] D.I. 40, Ex. M.  This PIP was in accordance with Nationwide's Employee Manual which recites, *inter alia*, "[p]erformance issues are first addressed through problem identification and coaching by your manager and may progress to Performance Improvement or termination if performance does not improve." *Id.*, Ex. L (Nationwide Employee Manual, § 12.  Attendance, Performance & Behavioral Issues).

[36] D.I. 42 at B-64; D.I. 40, Ex. B at 64.

[37] D.I. 40, Ex. B at 65.

[38] *Id.*, Ex. B at 65; *see also id.*, Ex. B at 112 (Olsen testifying that Sullivan accused Olsen of yelling at him during the PIP meeting).

[39] *Id.*, Ex. N.

following day, January 19, 2006, informing Hughes he needed time to research the information she requested and that he would get back to her as soon as possible.[40]  On February 7, 2007, having not received any information from Sullivan, Hughes again emailed him asking if he had gathered the requested information.[41]  Sullivan responded that afternoon, apologizing for the delay, and stating that he wanted to make sure his responses to Hughes' questions were accurate and that he hoped to supply his responses by the beginning of the following week.[42]  Sullivan did not provide the information at that expected time.

On February 20, 2007, Olsen created a PIP interim report (the "interim report"). That report stated Olsen and Sullivan had scheduled one-on-one meetings every other week beginning on January 24, 2007–following an initial meeting on January 23 to discuss current status and set priorities.[43]  According to the report, "[t]he focus of these first meetings has been to clarify and reestablish priories and on the importance of communication, both with management as well as with other members of the team. Based on observations, feedback from peers and status reports, performance improvement progress to date has not achieved expectations."[44]  The report specified reasons for Olsen's assessment that progress was not meeting expectations with regard to communications, system/IT process knowledge, and total cost of ownership and recited specific performance expectations for the second half of the PIP period.[45]

---

[40] *Id.*, Ex. N.
[41] *Id.*, Ex. N.
[42] *Id.*, Ex. N.
[43] *Id.*, Ex. O.
[44] *Id.*, Ex. O.
[45] D.I. 40, Ex. O.  As he did during the period of informal and formal coaching, Olsen updated Gilmore on Sullivan's performance during the PIP period.  D.I. 42 at B-65.

10

On the same date as the interim report, Sullivan provided his responses to Hughes' investigation questions.

Sullivan's February 20, 2007 email to Hughes recounted two dates when Olsen allegedly yelled at him.  Sullivan stated that on Wednesday, April 13, 2006, Olsen screamed at him on two separate occasions.  He stated that approximately a year earlier, in April 2005, Olsen yelled at him when he was working to provide information for the auditors.  With regard to the context of the event (apparently the April 2006 incident), Sullivan reported that while he was trying to resolve customer related issues, Olsen came up behind him waving his finger and screaming in rage.  The email stated that "[a]nyone in the immediate area could hear him screaming.  Later that day, a fellow associate who heard him screaming came to my office to console me."[46]  He stated the duration of the event was "long enough to make me feel intimidated and threatened by his rage" and that there was no resolution because, "despite my efforts, my manager would not discuss the incident with me."[47]  He did not provide a specific reason for failing to bring the incidents to the attention of management or HR prior to the initial PIP meeting, rather, he stated that "I went to talk to my manager about the incidents when I thought he had calmed down.  I asked him if he wanted to discuss his concerns on a professional level.  His response was a blank stare."[48]

Less than ten minutes after receiving Sullivan's email, Hughes emailed Regina Wheat (Senior Human Resources Consultant, Office of Associate Relations), indicating

---

[46] D.I. 40, Ex. N.
[47] *Id.*, Ex. N.
[48] *Id.*, Ex. N.

that she and Wheat had spoken about Sullivan previously and recounted that the first time Sullivan alleged that Olsen screamed at him was during the PIP meeting.  Hughes requested Wheat's thoughts on the matter.[49]  Later that day, Wheat responded to Hughes with the recommendation that she conduct an investigation of Sullivan's allegations via face-to-face interviews.  She provided Hughes with a list of questions for Olsen (who was to be interviewed first) and a separate list of questions to ask employees who sat near Sullivan, with instructions to document the response of the interviewees.[50]  Hughes was to tell the interviewees that her discussions with them were confidential, that they should not discuss the interviews with others, and that Nationwide had a no-retaliation policy under which they should not experience retaliation or retaliate against others because of the investigation.[51]  After the investigation was completed, Hughes was to schedule a meeting with Wheat to discuss the findings and how the outcome should be communicated to Sullivan.[52]

On February 28, 2007, Hughes interviewed Olsen about the incidents complained of by Sullivan.[53]  When asked to explain the allegation that he screamed and waved his finger at an associate, Olsen acknowledged that he "raised [his] voice in frustration and to try to get an answer" and denied waving his finger at anyone.  When asked why false allegations may have been made, he responded "[b]ecause of performance issues."[54]

---

[49] *Id.*, Ex. N.
[50] *Id.*, Ex. P.
[51] *Id.*, Ex. P.
[52] *Id.*, Ex. P.
[53] On this same date, Hughes left Sullivan a voice mail informing him of the initiation of her investigation.  D.I. 42 at B-138.
[54] D.I. 40, Ex. Q.

On March 12, 2007, Hughes interviewed Sullivan's co-worker Greg Kuchak.  He stated that his working relationship with his co-workers varied, but described his relationship with Olsen as "very good," stating that Olsen was an "open and honest" person.[55]  Kuchak reported that he had never witnessed a co-worker or manager displaying inappropriate behavior towards others, such as screaming or waving of fingers, commenting that he "would find it rather unusual."[56]  He stated his impression that Sullivan did not have a good relationship with Olsen, and noted "I find Barry hard to work with.  We have occasionally had heated discussions."[57]  When asked why someone might describe the work environment as intimidating and threatening, he opined such description might come from an employee who "felt like they could not talk to their manager freely or openly."[58]  He did note, however, that "things have gotten better in the [department] over time."[59]

On March 13, 2007, Hughes interviewed another of Sullivan's co-workers, Susan Bennett, who described "[g]ood working relationship[s]" with her co-workers and her relationship with Olsen as "[g]reat."[60]  Like Kuchak, she had never witnessed any inappropriate behavior by a co-worker or manager and could not "imagine that someone would describe the [working] environment as intimidating."[61]

After conducting her investigation, Hughes discussed the matter with Wheat and concluded that no violations of Nationwide policy had occurred.

---

[55] *Id.*, Ex. R.
[56] *Id.*, Ex. R.
[57] *Id.*, Ex. R.
[58] *Id.*, Ex. R.
[59] *Id.*, Ex. R.
[60] *Id.*, Ex. S.
[61] *Id.*, Ex. S.

On March 20, 2007, Olsen created a final report on Sullivan's PIP. In that report, Olsen once again concluded that "[b]ased on observations, feedback from peers and status reports, performance improvement progress has not achieved expectations."[62] The report specifically noted that Sullivan: demonstrated no progress or improvement in his communications; did not improve "his command of the system or . . . IT processes, consistent with his level and experience which would enable him to reduce his involvement in maintaining his responsible system or to be utilized in any cross-training initiatives which would allow him to be assigned to project work or tasks outside his normal area;" and that he continued "to spend excessive time/costs on Operational support tasks. As a result, there has not been any observable downward trend in the costs associated with the IMAC system due to the efforts on Barry's part."[63] Consequently, Olsen recommended to his supervisor, Gilmore, that Sullivan be terminated. Gilmore accepted that recommendation.[64]

On March 21, 2007, Wheat sent an email to Hughes recapping their conversation concerning Sullivan. That email stated that HR would advise Sullivan that Hughes' investigation of his complaints found no violations of company policy. The following day HR and Olsen were to discuss with Sullivan the outcome of the PIP, documenting that he failed to improve and, therefore, was being terminated due to performance.[65] On March 23, 2007, Hughes sent a fax to Wheat with a message that "[Olsen] also

---

[62] *Id.*, Ex. U.
[63] *Id.*, Ex. U.
[64] D.I. 42 at B-65. Olsen could not terminate Sullivan on his own as Gilmore's approval was required. *Id.*
[65] D.I. 40, Ex. T. Hughes was also instructed to "[c]ommunicate / seek approval of plan of action to appropriate leadership, based on protocol in your area."

documented info on last year's mid-year coaching and feedback and the annual performance review.  You should be able to view that in the system.  The first few pages were an explanation of the problem."[66]  That fax also includes the following handwritten annotations, apparently written by Wheat and dated March 26, 2007:  "Coaching 9/7/06"; "Feedback 10/6/06"; "Perf Imp 1/17/07-3/17/07"; and "OK w/ term."[67]  Sullivan was terminated on March 28, 2007.[68]

## III.  DISCUSSION

### A.  Standard on Motion for Summary Judgment

Under Rule 56(c) of the Federal Rules of Civil Procedure, a court is to enter summary judgment only when the record demonstrates that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  In deciding a motion for summary judgment, the court's role is not to weigh the evidence or to determine the truth of the matters asserted, but to determine whether there is a genuine issue of fact for trial.[69]  In so doing, the court must view all facts and draw all reasonable inferences in favor of the non-movant, take as true all allegations of the non-movant that conflict with those of the movant, and resolve all doubts against the movant.[70]  The court must also treat direct and circumstantial evidence alike.[71]

### B.  Title VII Discrimination and Section 1981 Discrimination

Counts I and II of Sullivan's complaint allege race discrimination in violation of

---

[66] *Id.*, Ex. V.
[67] *Id.*, Ex. V.
[68] *Id.*, Ex. X at ¶ 9.
[69] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)
[70] *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir. 1985).
[71] *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 94 (2003).

Title VII and § 1981, respectively.  Within those counts, plaintiff advances three separate claims of race discrimination under three separate theories:  discriminatory termination, hostile work environment, and discriminatory pay.[72]  Allegations brought under those statutes are each analyzed under the burden-shifting analysis established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*,[73] and clarified in *St. Mary's Honor Ctr. v. Hicks*.[74]

The *McDonnell Douglas* analysis consists of three stages.  First, plaintiff has the initial burden of establishing a *prima facie* case of discrimination.[75]  To establish a *prima facie* case, a plaintiff must demonstrate that he "is a member of a protected class and was qualified for an employment position, but that he . . . was fired from [that position] 'under circumstances that give rise to an inference of unlawful discrimination.'"[76]  There are many ways a plaintiff can demonstrate a circumstantial inference of discrimination, but he must produce "evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion . . . ."[77]  "The central focus of the *prima facie case* is always whether the employer is treating some people less favorably than others because of their race . . . ."[78]

---

[72] Counts I and II also contain retaliation claims and are discussed separately.

[73] 411 U.S. 792 (1973); *see also Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999) ("'[D]isparate treatment race discrimination claims under Title VII [and] section 1981 . . . require application of the familiar burden-shifting framework the Supreme Court articulated in *McDonnell Douglas* . . . .'").

[74] 509 U.S. 502 (1993).

[75] *Jones*, 198 F.3d at 410.

[76] *Waldron v. SL Indus., Inc.*, 56 F.3d 491, 494 (3d Cir. 1995) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

[77] *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 355 (3d Cir. 1999) (quoting *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312 (1996)) (alterations in original).

[78] *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003) (quoting *Pivirotto*, 191 F.3d at 352).

If plaintiff establishes a *prima facie* case, the burden of production shifts, and the employer must "articulate some legitimate, nondiscriminatory reason for" its actions.[79]  If the employer articulates "a legitimate reason for the unfavorable employment decision, the burden of production rebounds to the plaintiff, who must . . . show by a preponderance of the evidence that the employer's explanation is pretextual."[80]  To demonstrate pretext, plaintiff must provide evidence that would allow a fact finder reasonably to "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not the motivating or determinative cause of the employer's action."[81]

1.   Discriminatory Termination

Sullivan contends the evidence establishes a *prima facie* case of race discrimination with respect to his claim of discriminatory termination in that:  as an African-American he is a member of a protected class; who with many years as an IT employee was qualified for his position; that his termination was an adverse employment action; and that his termination occurred under circumstances giving rise to an inference of unlawful discrimination.

Defendant does not present argument contesting that Sullivan has established a *prima facie* case for his discriminatory termination claim.  Instead it contends that, even assuming for the sake of argument that such case has been established, his claim nevertheless fails because Nationwide has proffered a legitimate, non-discriminatory

---

[79] *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994) (quoting *McDonnell Douglas*, 411 U.S. at 802).

[80] *Id.*

[81] *Id.* at 764.

reason for his termination.  Nationwide states that Sullivan was terminated after

deficiencies in his performance became apparent to Olsen, and after plaintiff failed to

demonstrate improvement despite an extended period of informal coaching, formal

coaching, and the institution of a PIP.  Nationwide maintains that Sullivan cannot show

its purported reason for termination is pretext for intentional race discrimination.

To avoid summary judgment, Sullivan must point to evidence that would allow a

fact finder to reasonably infer that Nationwide's reasons were either a post-hoc

fabrication or otherwise did not actually motivate the employment action.[82]

> To discredit the employer's proffered reason, however, the plaintiff cannot
> simply show that the employer's decision was wrong or mistaken, since
> the factual dispute at issue is whether discriminatory animus motivated the
> employer, not whether the employer is wise, shrewd, prudent, or
> competent.  Rather, the non-moving plaintiff must demonstrate such
> weaknesses, implausibilities, inconsistencies, incoherencies, or
> contradictions in the employer's proffered legitimate reasons for its action
> that a reasonable factfinder *could* rationally find them "unworthy of
> credence," and hence infer "that the employer did not act for [the asserted]
> non-discriminatory reasons."[83]

The Third Circuit has stated that "[w]hile this standard places a difficult burden on the

plaintiff, '[i]t arises from an inherent tension between the goal of all discrimination law

and our society's commitment to free decisionmaking by the private sector in economic

affairs.'"[84]

Sullivan argues that Nationwide's purported non-discriminatory reasons for

---

[82] *Fuentes*, 32 F.3d at 764 ("[T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons . . . was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext).") (emphasis in original) (citations omitted).

[83] *Fuentes*, 32 F.3d at 765 (citations omitted) (alteration and emphasis in original).

[84] *Fuentes*, 32 F.3d at 765 (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir.1992)) (second alteration in original).

termination are pretextual and not credible.  In support of that argument, Sullivan alleges Olsen subjected him to almost constant harassment not suffered by his white colleagues.  Sullivan also points to his long tenure as a Nationwide employee and the positive reviews he received during his employment.  He further contends that the evidence shows he was denied training opportunities to enhance his job performance and that Olsen falsified and/or made misrepresentations in records concerning his performance which tainted the opinions of senior management toward him.

At the outset, the court notes that Sullivan collapses arguments in favor of his discriminatory termination and hostile work environment claims into a single section of his opposition brief.  Many of those arguments overlap his bases of support for those two theories of liability, as well as, his retaliation and breach of the covenant of good faith and fair dealing claims.  Aside from his disparate pay claim, the court's determination of the merits of those arguments are determinative of plaintiff's other causes of action.  To avoid repetition, therefore, the court will address each of Sullivan's arguments in this first section and simply refer back to those determinations, and their effect on his other claims, in the subsequent sections of this order.

Sullivan testified that Olsen screamed and yelled at him "almost on a regular basis"[85] and alleges that his white colleagues did not suffer such harassment.  Although he testified that "no one else *appeared to be harassed* in and outside his office,"[86] he denied any knowledge of whether Olsen yelled at those other employees.  When asked if he was "the only one [Olsen] yelled or screamed at" Sullivan answered, "*I don't know.*

---

[85] D.I. 42 at B-22.
[86] *Id.* at B-23.

I wasn't privy to any conversations he had with anybody else screaming."[87]   Sullivan

alleges that Olsen's harassment began well before the April 2006 IMAC incident and the

subsequent PIP training.   However, in the statement of facts section of his opposition

brief, he avers that "[i]n April of 2006, from April 4 to April 14, Plaintiff's department

encountered issues with the IMAC system. . . .   *As a result of this incident*, Olsen

expressed prejudice and bias toward Plaintiff."[88]   The record supports the statement that

Olsen's purported continual harassment did not begin until the April 2006 incident,

which Olsen described as the "triggering event."[89]   Sullivan likewise testified that prior to

that incident Olsen was "somewhat irritable," but that after that incident Olsen's behavior

toward him changed:   "[i]t seemed to even intensify even more, the harassment."[90]

Moreover, when asked when "the *first time* [was] that you had *any sort of problem* with

Mr. Olsen or *any problem* with the way he treated you," Sullivan responded that it was

"[a]pproximately *a year after I worked for him or so*."[91]   In response to the question of

whether Olsen constantly yelled at him during the entire period of time Olsen was his

manager, Sullivan reiterated, "[n]o.   What I'm saying for the first year, I had *no issues*

that I could recall working with him.   Things appeared to be pleasant.   He had no issues

with my work. . . .   There were no issues *until the next year, at some point* . . . ."[92]   He

---

[87] *Id.* at B-22 (emphasis added).

[88] *Id.* at 7-8 (emphasis added).

[89] D.I. 40, Ex. B at 75 (Olsen testified that as a result of the April 2006 incident, he determined further coaching of Sullivan was required.   "This was the trigger event, because it was highly visible.   It impacted our business users.   It was reported to my management and my manager's management.   They had a dissatisfaction with the length of time that, as a manager, I felt it necessary that we really start–I really needed to start taking steps to . . . improve Barry's performance.").

[90] D.I. 42 at B-29.

[91] *Id.* at B-22 (emphasis added).

[92] *Id.* (emphasis added); *see also id.* at B-24 (Sullivan could not enunciate any particular issues he had with Olsen during the first year, and stated that "I didn't have the same issues that I had *the second year or so*.") (emphasis added).

20

stated that "[t]he first year, there was no objection really to my work performance.  He gave me a great review.  It appeared that things were okay."[93]  Also, when Hughes was investigating his allegations of harassment by Olsen, he only specified two dates that Olsen yelled at him, April 13, 2006 and sometime in April of 2005.[94]  Further, Olsen's positive review of Sullivan covered the entire year of 2005, and contained positive mid-year and annual comments of Sullivan's performance.[95]  The evidence therefore supports Olsen's testimony that the April 2006 IMAC incident was the triggering event that led him to more closely scrutinize Sullivan's performance:  Sullivan testified that Olsen's attitude toward him changed at some point during the second year he worked for Olsen; Olsen had a favorable impression of his work at least through the end of 2005 when he reviewed Sullivan positively; and–other than an isolated incident in April 2005–Sullivan reported to Hughes that he was yelled at twice on April 13, 2006–the day prior to Sullivan's resolution of the IMAC issue which had begun on several days earlier.

The court also notes that, Sullivan's account of the April 2006 IMAC incident, which resulted in Olsen yelling at him on April 13, 2006, does not support a reasonable inference that Olsen's treatment of him on that day was due to his race.  Sullivan testified that during the time the system was down, Matt Dunne (who was the director of the user area affected by the system outage) called Sullivan to his office emphasizing

---

[93] *Id.* at B-24; *see also id.* (repeating that during the first year he worked for Olsen, Olsen did not have a problem with his performance and gave him a positive evaluation).
[94] D.I. 40, Ex. N.
[95] *See* D.I. 42 at B-102-B-113 (The 2005 review states that it covers the dates 01/01/05 to 12/31/05).

that the system outage had to be resolved and asking Sullivan what could be done.[96]

Sullivan stated that Dunne was unhappy because he felt that Olsen was not taking the

matter seriously.  Sullivan suggested that Dunne would have to call Olsen's superior,

Gilmore, as Sullivan did not have the authority to request help from Nationwide

engineers outside of his office who might be of assistance in solving the problem.

Sullivan alleges that when Olsen learned of that conversation, he was extremely irate

that Sullivan "went over his head" and that Sullivan "was going to pay for this some kind

of way."[97]  Although Olsen acknowledged raising his voice in frustration at Sullivan,[98]

nothing in that interaction as related by Sullivan suggests racial animus, rather it reflects

a manager, whether appropriately or not, becoming incensed by a subordinate's

perceived undermining of his authority.

   To the extent that Sullivan alleges constant harassment in the form of yelling and

screaming by Olsen from April 2006 until his termination, other than Sullivan's own

testimony, the record does not support that allegation.  First, the day after Sullivan

made allegations concerning Olsen's conduct toward him during the PIP meeting,

Hughes, herself an African-American, emailed Sullivan stating that:

> As a follow-up to our conversation, I would like to begin my investigation
> regarding the *incident(s)* in which your manager yelled at you.  You
> indicated that you did not want to discuss or provide associate names who
> may have witnessed the *situation(s)* in order to protect them.  Please
> provide me with any supporting information you may have including:
> *Date(s)* of the event/incident
> Context of the event/incident

---

[96] D.I. 42 at B-26.  Sullivan's written summary of the incident states that Dunne requested a status update from Sullivan the afternoon of April 10, four days after the system was reported to be malfunctioning.  D.I. 40, Ex. E.

[97] D.I. 42 at B-26.

[98] D.I. 40, Ex. Q.

Duration of the event/incident
Resolution of the event/incident
Any reason why this was not brought to management/HR attention prior to
yesterday.[99]

After responding twice to Hughes' inquiry stating that he "need[ed] some time to

research the information you requested," and that he "want[ed] to ensure my response

to your questions is accurate," he eventually responded on the day of Olsen's interim

PIP report which concluded that he was not progressing satisfactorily.[100]  Despite his

allegation that Olsen yelled at him regularly, Sullivan reported only two dates of such

interaction to Hughes:

> To the best of my knowledge, *the incidents* occurred on or around the
> following dates:
> On Wednesday, April 13, 2006, there were two separate incidents when
> my manager screamed at me.  There was another incident approximately
> a year earlier (4/05), when I was working to provide information for the
> auditors.[101]

Hughes' email does not suggest Sullivan limit his response in any way.  Hughes

informed Sullivan she wanted to investigate "the incident(s)" of yelling; that Sullivan did

not want to name specific witnesses to "the situation(s)"; and asked for certain

information, including the "date(s) of the event/incident."  Despite the apparently

unambiguous nature of Hughes' email, at deposition Sullivan testified that "[Hughes]

asked me for some specifics, and I said on the, almost on a regular basis, and I gave

---

[99] *Id.*, Ex. N (emphasis added).
[100] D.I. 40, Ex. N.  Sullivan testified that he did not recall what he needed to research in order to answer Hughes' questions.  D.I. 42 at B-32.  Sullivan also stated that after the meeting with Olsen to discuss Olsen's interim PIP conclusions that he "remember[ed] having some meeting with Ken at which time it didn't appear to me that, at least my impression, I didn't believe that I was going to meet whatever requirements that I needed to maintain my employment there."  D.I. 42 at B-48.
[101] D.I. 40, Ex. N (emphasis added).

her, because she asked me for two dates."[102]   When asked to confirm that Hughes only

requested two dates, Sullivan responded that "[s]he asked me for some specific times,

and I gave her two dates.  I told her on a regular basis almost."[103]   When asked why he

did not allege in his email that Olsen yelled at him on a regular basis, Sullivan stated:

"[b]ecause I didn't.  That's what was asked of me, to give them some dates, a couple

dates.  I did as they instructed."[104]   Giving Sullivan the benefit of the doubt and

accepting that Sullivan may have misunderstood the level of detail Hughes was

requesting, the record does not support his allegation of continual yelling by Olsen.

Sullivan testified that Olsen would yell at him "on a regular basis" and that

"everybody in the area could hear . . . ."[105]   His email to Hughes also asserted, with

respect to one of the specified incidents of yelling, that "[a]nyone in the immediate area

could hear him screaming.  Later that day, a fellow associate who heard him screaming

came to my office to console me."[106]   Sullivan explained that he listed the two specific

dates in his email to Hughes "because I know for a fact that there were a lot of people

around when he went berserk . . . .  I knew at least these two, because I had associates

that came up to me and said, you know, are you all right, are you okay, that kind of

thing."[107]   Although Sullivan did not want to give Hughes the names of individuals who

witnessed Olsen's alleged harassment, he "was certain that she could find out from

---

[102] D.I. 42 at B-31.
[103] *Id.*
[104] *Id.* at B-34; *id.* ("[Hughes] asked, and I'm paraphrasing, some incidents that she could follow up on and investigate.  She didn't ask me, to the best of my recollection, all incidents when after I said this was on a regular basis.  She asked me for some specifics.").
[105] *Id.* at B-25; *id.* at B-23 ("[I]t was obvious to associates and team members because the screaming in the halls, in my office and outside his door, they would come and try and console me and say, are you okay, what's going on.").
[106] D.I. 40, Ex. N.
[107] D.I. 42 at B-37.

anyone in the area about the kind of abuse that I was subject to."[108]  Sullivan specifically testified that he believed Greg Kuchak would have witnessed the April 2006 yelling incident, particularly since his cubicle was close to Sullivan's.[109]  And yet, Kuchak was one of the employees interviewed by Hughes during her investigation of plaintiff's complaint and denied witnessing Olsen's alleged behavior.  Kuchak described his relationship with Olsen as "very good" and that "[Olsen] is open and associates are open [with him].  He is open and honest."  Hughes' interviewees were not asked about a specific date, incident, or individual.  When asked if he had "*ever* witnessed a co-worker or manager displaying inappropriate behavior towards others such as screaming or waving a finger," Kuchak answered "[p]ersonally–I have not.  I would find it rather unusual."[110]  The other employee Hughes interviewed, Susan Bennett, also denied *ever* witnessing a co-worker or manager displaying the inappropriate behavior alleged by Sullivan and that she could not "imagine that someone would describe the environment as intimidating."[111]  The evidence, therefore, contradicts, rather than supports Sullivan's allegation that Olsen constantly yelled at him.

---

[108] *Id.* at B-31.

[109] *Id.* at B-37.

[110] D.I. 40, Ex. R (emphasis added).  At his deposition, Sullivan also named other employees he believed witnessed Olsen yelling at him that were not interviewed and argues in briefing that there is no record that HR interviewed those individuals.  D.I. 42 at B-37, *id.* at 10.  Sullivan, however, declined to give Hughes specific names of purported witnesses.  Also, as noted, Kuchak was an employee Sullivan testified had likely witnessed Olsen's behavior toward him.  Moreover, Wheat instructed Hughes to interview "associates who sit near [Sullivan]," D.I. 40, EX. P, neither of whom substantiated Sullivan's allegations despite his testimony that "I was certain that [Hughes] could find out from anyone in the area about the kind of abuse that I was subject to."  D.I. 42 at B-31.  The testimony of both Sullivan and Olsen indicates that members of the IT team sat in relatively close proximity to each other.  *See id.* at B-56 (Olsen testified that "[I]n general, most of my team sat in two rows outside my office. . . .  The rows were just off center. . . .  The first row was just to the left of my office door, running out.  And the next row after that . . . [w]as further to the left . . . ."); *id.* at B-32 (Sullivan testified that a particular employee who allegedly heard Olsen's yelling was "several cubicles over, 50, 100 feet away . . . .").

[111] D.I. 40, Ex. S.

25

The evidence of record also does not support Sullivan's contention that his delay in addressing Olsen's alleged behavior was "mainly due to threats levied by Olsen" but that "Olsen's harassment eventually led [Sullivan] to complain to H.R. despite the ever-present threats of retaliation levied by Olsen."[112]   There is no support in the deposition citation pointed to by plaintiff for that contention.   On the pages cited, Sullivan did not testify that he failed to report Olsen's behavior due to threats by his manager.   Rather, he testified that he told Hughes that:

> I was being harassed and I believe that there was some racial issues going on here, personal racial issues going on here.  And that this has been going on on a regular basis and I was being, feeling humiliated and being threatened, and one of the reasons why I was careful about not naming names, but I was certain that she could find out from anyone in the area about the kind of abuse that I was subject to.[113]

In other parts of his deposition testimony Sullivan did allege that "[Olsen] just threatened me and said that if I wanted to go talk to someone else, the vice president or what have you, this would happen, your days are numbered, this and this. . . .  And he said, you can go to Rachel, I already talked to them, and they understand"[114] and that "[Olsen] [t]hreatened my position, if I was to talk to someone about some of the things that he was bellowing, these issues that he had."[115]   Significantly, however, in his response to

---

[112] D.I. 42 at 21 (citing D.I. 42 at B-31).

[113] *Id.* at B-31.

[114] *Id.* at B-23.

[115] *Id.* at B-25.  Sullivan's testimony reveals that some of these "threats" were made during the formal coaching sessions, or during the PIP when he was on notice of possible termination, in connection with assignments he had to complete.  *See id.* ("[Olsen] would say things in his rage, which I tuned out a lot.  If you want to talk to my boss or her boss about anything we said, you know, your termination, you only have so many days to complete these assignments and you need to manage your time to get these things completed and they are aware of these issues.  These are the kinds of things you need to do to save your job . . . your job is on the line, if you don't get these . . . things done.").  The court notes that, in connection with the April 2005 yelling incident Sullivan reported to Hughes, he acknowledged that, though Olsen was very upset with him, "[Olsen] didn't threaten me at that point that he would–I would lose my job if I would mention this to someone else, or anything like that.  That happened later."  *Id.* at B-36.

Hughes' question as to why he had not brought his complaints about Olsen to the attention of HR prior to the initial PIP meeting, he did not make any allegations about threats of retaliation, or even provide a coherent answer; rather he stated that "I asked [Olsen] if he wanted to discuss his concerns on a professional level.  His response was a blank stare."[116]  In his email providing requested information to Hughes, in addition to not alleging Olsen threatened his job, Sullivan did not allege that Olsen's conduct was racially motivated.[117]  Also, Hughes' communications with Wheat discussing the matter, how to investigate the allegations, and the result of the investigation only recounted Sullivan's accusation that Olsen screamed at him; there was neither mention of any allegations of threats or racial motivation associated with Olsen's conduct, nor that such conduct was a regular occurrence.[118]  It was only in an email from Sullivan to Hughes on March 23, 2007, six days after the PIP was to have been completed, that there is a record of Sullivan mentioning discrimination.  In that email he wrote, "I have not received the status from your investigation.  Would you please send me your status?  It appears that no matter what I do my manager is not satisfied.  I am registering a compl[ai]nt of discrimination.  Let me know if you have any questions, or concerns."[119]

---

[116] D.I. 40, Ex. N.  The court again notes that it was at the initial PIP meeting that Sullivan first made allegations about Olsen's behavior and that, under the PIP, "[f]ailure to make on-going and consistent improvement during Performance Improvement may result in early termination."  *Id.*, Ex. M.

[117] *Id.*, Ex. N.

[118] *Id.*, Ex. N (recounting that Sullivan "mention[ed] an incident in which his manager 'screamed' at him"), Ex. P (recommending "an investigation of . . . Sullivan's allegations" and attaching questions for interviewees concerning allegation of screaming and waving of finger), Ex. T (noting Sullivan's "concerns. (i.e. manager raising voice when talking to Barry)").

[119] D.I. 42 at B-138.  At deposition, Sullivan denied this email was the first time he registered a complaint of discrimination.  In making that denial, he does not reference HR, but rather purported conversations with Olsen during the coaching or PIP periods:  "it's not the first time I registered a complaint of discrimination.  Again, I spoke to my manager several times about this.  I believe that it was something personal, and I talked to him about it and he either not responded or reminded me of my deadlines and termination, and I was free to speak to his boss or HR, but they had, he said he had already

Sullivan also maintains that Nationwide's contention that performance deficiencies, first identified in 1999, were the bases for termination is shown to be pretextual in light of his continued employment with Nationwide for many years in the same position after discovery of those purported deficiencies.  He stresses the implausibility of Nationwide continuing to employ him for that length of time if his performance was of poor and deficient quality.  Sullivan argues that his job performance during his tenure at Nationwide demonstrates that he was an asset to the company. Sullivan supports that argument with extensive citation to his positive performance reviews from other managers.  With regard to those prior reviews, the court notes that while they contained many positive statements about Sullivan, they were not uniformly positive.  Hearn's 1999 evaluation rated Sullivan's overall performance as "Occasionally Meets Expectations."[120]  Although his performance showed improvement in the 2000 and 2002 reviews by Hearn, with his overall performance rated as "Meets Expectations," he continued to be rated "Occasionally Meets Expectations" in some areas.[121]  Sullivan's testimony indicates he did not believe that any negative assessment in these earlier reviews was due to discrimination as he stated that none of his earlier managers had discriminated against him based on his race.[122]  The reviews by

---

spoken to them, they were aware of the situation."  *Id.* at B-38.

[120] D.I. 40, Ex. C.

[121] D.I. 42 at B-67-B-73; B-74-B-82.  As noted in the Background section, Hearn's overall rating of Sullivan in his 2002 review was "Meets Expectations," however, she included a minus sign ("-") next to that selection box indicating that, overall, Sullivan was, at least slightly, below meeting expectations.  *See id* at B-81.

[122] D.I. 40, Ex. A at 212-13 ("Q.  How about Susan Hearn, any reason to believe that she took any action against you because of your race?  . . .   A.  I would say no.  I don't believe she's a racist, if that's what you're asking.  A.  That's generally what I'm asking.");  D.I. 42 at B-15 ("Q.  Before Mr. Olsen became your supervisor in 2004, did you have any reason to believe that you had been or might be the victim of race discrimination at Nationwide?  A.  No,  . . . that wasn't part of my thinking at the time.").

Alessandrine in 2003 and 2004 indicate that Sullivan was meeting or exceeding his performance criteria.[123]  Sullivan also points to his 2005 review by Olsen which similarly indicated he was meeting or exceeding performance criteria and Olsen's positive comments in that review and in his deposition testimony.[124]

Even if Sullivan's prior managers had universally praised his performance, such reviews would not necessarily establish pretext.  Courts in this circuit have held that prior positive performance reviews alone are not sufficient to defeat summary judgment.[125]  Also, Olsen's positive 2005 review of Sullivan seems to cut against his

---

[123] D.I. 42 at B-83-B-91; B.92-B-101.

[124] D.I. 42 at B-102-B-113; D.I. 40 at B-55, B-62 (Olsen testifying that when he was supervising Sullivan, he showed an extraordinary amount of dedication and responsibility and that he worked long hours, including on the weekend, to attempt to accomplish his daily objectives).

[125] *See, e.g., Turner v. Schering-Plough Corp.*, 901 F.2d 335, 343-44 (3d Cir. 1990) (even "highly favorable" performance reviews from prior supervisors were insufficient to establish pretext where there was "no evidence tending to show that serious and unattended problems did not exist within his jurisdiction or that [the supervisor's] other criticisms at the time of the demotion decision were unjustified"); *Haskins v. Christiana Health Servs.*, Civil Action No. 08-776-ER, 2010 WL 1328998, at *7 (D. Del. Apr. 1, 2010) (granting summary judgment to employer and noting that "[plaintiff] points to no additional evidence of racial discrimination, such as derogatory comments or actions, which could support an inference of discrimination.  Moreover, . . . [defendant] acted strictly within the bounds of the Disciplinary Policy in dismissing [plaintiff].  Therefore, these [past] positive evaluations, without more, do not support an inference of discrimination . . . ."); *Finn v. J.B. Hunt Transp. Servs., Inc.*, No. 07-4851, 2009 WL 2058850, at *5 (D.N.J. July 7, 2009) (granting motion for summary judgment and holding that prior positive performance reviews from another supervisor were not sufficient to create pretext.); *see also Hunter v. Rowan Univ.*, 299 Fed. Appx. 190, 195 (3d Cir. 2008) (Unpublished Opinion) (affirming grant of summary judgment to employer and holding that "[t]he mere existence of positive evaluations by a supervisor does not give rise to the inference that negative evaluations from another supervisor were a pretext") (According to CTA3 App. I, IOP 5.7, "The court by tradition does not cite to its not precedential opinions as authority. Such opinions are not regarded as precedents that bind the court because they do not circulate to the full court before filing.").  Courts in other jurisdictions have similarly concluded that the mere existence of past positive performance reviews is insufficient to establish pretext.  *See, e.g., Riley v. Lance, Inc.*, 518 F.3d 996, 1002 (8th Cir. 2008) ("[Plaintiff's] reliance on previous positive performance evaluations in support of his argument is misplaced.  Past performance evaluations–especially where, as here, they were given by different supervisors–cannot be used to show that [plaintiff] was meeting [the company's] expectations a year or more later when [plaintiff] was terminated."); *Rojas v. Florida*, 285 F.3d 1339, 1343 (11th Cir. 2002) ("[D]ifferences in the evaluation of [plaintiff's] performance do not establish a genuine issue on pretext. Different supervisors may impose different standards of behavior, and a new supervisor may decide to enforce policies that a previous supervisor did not consider important."); *Rodriguez-Cuervos v. Wal-Mart Stores, Inc.*, 181 F.3d 15, 20 (1st Cir. 1999) (stating that, although plaintiff had worked in different capacities at different stores, the fact that the manager who had given a negative evaluation "may have had different expectations for [plaintiff], even if those expectations were contrary to those of [plaintiff's] prior supervisors, does not support a finding of pretext"); *Weitlauf v. Parkway Sch. Dist.*, 4:07CV00407

29

argument that race was the motivating factor for his later negative assessment of Sullivan's performance.  Olsen did not become Sullivan's supervisor and immediately give Sullivan a negative review.  Olsen's 2005 review of plaintiff was positive, and Sullivan viewed the first year under Olsen's management as "pleasant," with Olsen not having a problem with his work.  Moreover, as Nationwide argues, Sullivan "essentially asks the Court to believe that Mr. Olsen <u>became</u> a racist at some point between 2004, when he began managing Plaintiff, and 2006, when he began to criticize Plaintiff's job performance."[126]  It contends, therefore, that it would be unreasonable to "infer that the sudden, unexplained transformation of the formerly 'pleasant' Mr. Olsen was caused by racism and not the ongoing, documented deficiencies in Plaintiff's performance."[127] Nationwide posits that Olsen's acknowledgment that Sullivan was a diligent employee does not establish that his criticism of plaintiff's performance in other areas was pretextual because a plaintiff cannot establish pretext simply by showing that he was working hard or doing the best he could.[128]  The court finds Nationwide's argument persuasive and determines that plaintiff's past positive performance reviews are

---

ERW, 2008 WL 3925162, at *9 n.8 (E.D. Mo. Aug. 20, 2008) (noting that "different supervisors may have different expectations resulting in different evaluations").

[126] D.I. 44 at 5 (emphasis in original).

[127] D.I. 44 at 5.

[128] *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108-09 (3d Cir. 1997) ("'To discredit the employer's proffered reason . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.  Rather, the nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence.'") (quoting *Fuentes*, 32 F.3d at 765) (omission in original)*; id.* at 1109 (Plaintiff "cannot survive summary judgment . . . simply by pointing to evidence that could convince a reasonable factfinder that he did as well as he could under the circumstances. . . .  [H]e must show, not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason."); *see also See Hunter v.  Rowan Univ.*, 299 Fed. Appx. at 195 (Unpublished Opinion) (plaintiff's assertion that she was doing the best she could was insufficient to withstand summary judgment) (citing *Keller*, 130 F.3d at 1109 (3d Cir. 1997)).

insufficient, alone, to establish that Nationwide's proffered reasons for termination were mere pretext.

Sullivan also argues that he was denied training opportunities, in general, and specifically with regard to the IMAC system.  Sullivan contends as a result of an improper racial motive Olsen denied him training intended to improve efficiency that was provided to his Caucasian peers.  He also alleges that he was not provided resources, such as IMAC system manuals, to help improve his work product.  The issue of plaintiff wanting, or being promised, training did not begin when Olsen became Sullivan's manager, however.  In her 2002 review, Hearn wrote that Sullivan was unable to complete a particular project and that he was "unable to demonstrate to his management that he had a solid understanding of the business requirements and how to implement them.  His analysis and subsequent project development was not performed in an organized fashion."[129]  When asked whether he recalled being unable to complete that project, Sullivan responded that "I recall not getting the training to begin the project."[130]  When asked if Hearn's statement that his analysis and subsequent project development was not performed in an organized fashion was accurate, he responded, "I would say yes with a caveat, that it was–I didn't have the training to perform that responsibility, that matter."[131]  His response to a query as to why he did not get the training was:  "[t]hat's a good question.  I didn't get training on any of these

---

[129] D.I. 40, Ex. D.  Hearn wrote that his inability to complete the project "was *in part due to minimal Notes training* and the lack of a 'mentor' who could work with Barry and provide on-the-job assistance." D.I. 40, Ex. D (emphasis added).
[130] D.I. 42 at B-14.
[131] *Id.*

criticisms . . . ."[132]  He noted that Hearn's 2002 review included as "Objective[s],"

improvement in communication and documentation skills, with "class[es], as available

and appropriate" listed under "Action plan;" and that other of his earlier reviews had

mentioned his need for classes.[133]  Indeed, Hearn's 1999 review included a training plan

with certain topics:  System Development Methodology; Relational Database Concepts

and Design; Communication Skills; Visual Basic; and Client Server Fundamentals and

stated he was to have training on each of those topics in the following three to twelve

months.[134]  Hearn included a similar note in her 2000 review of Sullivan:  "give Barry

new tech. training . . . to enable him to move on to new tech. projects," which was to

occur in the first half of 2000.[135]  Despite the indication of needed training on those

reviews, Sullivan stated that he "didn't get the training that was promised me."[136]  At the

time, he believed he did not get the promised training due to lack of funds, but he also

stated that "my peers were all going to classes."[137]  And yet, he did not believe that

Hearn, or any other manager prior to Olsen, harbored any racial animus toward him.[138]

Sullivan testified that it was only under Olsen that he believed he was treated

differently than other IT employees with regard to training opportunities.[139]  As an

---

[132] *Id.*

[133] D.I. 42 at B-14; D.I. 40, Ex. D.

[134] D.I. 40, Ex. C.

[135] D.I. 42 at B-72.

[136] *Id.* at B-14.  He asked Hearn "in general about training that I seldom got on any system, including the communications or anything to that effect" but he "[j]ust didn't receive any training."  *Id.* at B-19.

[137] *Id.* at B-14.

[138] D.I. 40, Ex. A at 212-13; D.I. 42 at B-15.  When asked "prior to reporting to Mr. Olsen, did you believe you had *sufficient training* in order to perform all of your duties in a competent manner," Sullivan replied "[n]o," even though he believed he was, nevertheless, able to perform his duties in a competent manner.  D.I. 42 at B-21 (emphasis added).

[139] D.I. 42 at B-19.

example, he testified that "there were training classes to upgrades to the system, to the programming languages, . . . that . . . the associates go through.  I never received those kind of upgrades specific to our languages."[140]  Even though he alleges being denied training that his co-workers received, he testified that Olsen did not tell him "no" to specific requests to attend certain classes, but that "I never attended, never got to go to those classes."[141]  Sullivan's own testimony that his 2002 review from Hearn indicated a need for training, and that while his "peers were all going to classes" and he "didn't get the training that was promised," contradicts the assertion that only under Olsen was he purportedly treated differently than other IT employees with regard to training opportunities.

With specific regard to lack of training on the IMAC system and not being provided with system manuals, the record indicates that no such training was available. Sullivan testified that the IMAC system was a "legacy system" that was on "life support."[142]  He stated that, although he had worked on the IMAC system for several years, by the time Olsen became his manager he did not consider himself well-versed on the system because of his lack of training.[143]  He stated that he had asked for training on the IMAC system as far back was when Williams was his manager.[144] Williams, his supervisor prior to Hearn, had promised him training on it, but he did not

---

[140] *Id.*

[141] *Id.* at B-20.

[142] *Id.* at B-16.  He also testified that he believed the system "was never upgraded.  Parts of the system had a lot of problems with like the claims and the accounting part, I guess it was just the pre-updates.  It had a lot of problems."  *Id.* at B-18.

[143] *Id.* at B-16.  He reiterated that despite his years working on the IMAC system he did not feel knowledgeable about it because "I was never trained on that system."  *Id.* at B-17.

[144] *Id.* at B-17, B-18.

receive training because "[t]here was no one to train me other than fixing problems."[145]
Sullivan testified that "[a]ll the people that worked on the system . . . that knew the
system had left."[146]  He knew of "no one that I worked with that fixed the problems [with
the IMAC system].  They mended, kept it on the respirator . . . ."[147]  He stated that the
only help available was a team member "who would give me instructions, writeups, to fix
problems in the system, to keep it running, from going down or dying."[148]  With regard to
manuals, rather than being denied IMAC manuals to help his understanding of the
system, he testified that he believed "there were no manuals.  I tried to dig up manuals.
One co-worker saved some from the trash . . . and I read what I could of the system . . .
."[149]

Sullivan also alleges that Olsen falsified reports and/or misrepresented
information therein with regard to his performance.  Sullivan contends that through his
false reports, Olsen controlled the flow of information to more senior employees relating
to his job performance, whose opinions of Sullivan were thus negatively influenced.

One such allegation is that Olsen falsified information to indicate that he and

---

[145] *Id.* at B-17.  Olsen likewise testified that he was unaware of any type of training Sullivan could have received to increase his knowledge of the system and his technical skills and that he expected Sullivan to improve his performance "[b]y learning and doing."  "I expected him to learn that system as anyone else on my team learned their systems as they picked it up, by working on the system, by looking through the code, by creating documentation which would help increase their knowledge, as well as other people's, of the system."  *Id.* at B-59-B-60.

[146] *Id.* at B-16.

[147] *Id.* at B-17.

[148] *Id.* at B-16.  The only help he was given "was someone would give me instructions to fix or correct an issue in the system, not fix the problem, but to get beyond the point where the system would stop functioning."  *Id.* at B-17.  "[Williams] gave me what was available, which was another associate who I could pick as much as I could, and they didn't have–they weren't trained in IMAC.  They just knew that they were there to work on the system, and I asked to help.  I mean they were in the same boat, the same situation."  *Id.* at B-18.

[149] *Id.* at B-18.  That co-worker had saved the IMAC manuals during a prior merger of an insurance company that was a predecessor in interest to Nationwide.  *Id.*

plaintiff were meeting more often than usual.  In support, he cites his testimony that Olsen "noted that we had on occasion met more regular than we really had" and that "I'm not certain about whether we even met August the 31st."[150]  The record, however, includes a document titled "Performance/Attendance Coaching" stating that he and Olsen would schedule weekly meetings to help improve his performance.  Both Olsen and Sullivan signed and dated that document on August 31, 2006.[151]  From his testimony, it appears that Sullivan was questioning whether he specifically discussed his 2006 performance review, also dated August 31, 2006, which detailed areas where Sullivan was failing to achieve certain performance objectives.[152]  In any event, it is evident that a meeting did take place between the two on that date.  The following day, September 1, 2006, Olsen emailed Hughes a copy of the "PMP Coaching and Feedback report" and "HR Coaching form" that "[Sullivan and I] reviewed, a copy of which was given to [Sullivan]."  In a subsequent email in the chain, dated September 6, Olsen informed Hughes that the first coaching session was scheduled for the following day.[153]  That September 7, 2006 coaching session was referred to in an email "[t]o follow-up on our coaching session" from Olsen to Sullivan on the same date.[154]

When asked if he had weekly meetings as contemplated in the Performance/Attendance Coaching report, Sullivan testified that he "had some meeting[s] with him . . . when we started this, but we didn't always meet.  He had some meetings that he had to attend and, you know, he would say we'll have to get back

---

[150] *Id.* at B-39.
[151] D.I. 40, Ex. H.
[152] D.I. 42 at B-39-B-40.
[153] D.I. 40, Ex. G.  Olsen's supervisor, Gilmore, was also a "cc" recipient of those emails.
[154] *Id.*, Ex. I.

together and reschedule, so we'll go a week or two before we meet again."[155]  He did

acknowledge that, whether they occurred on a weekly basis, he and Olsen had

occasion to meet in September and October 2006.[156]  This is verified by additional

follow-up emails from Olsen to Sullivan, dated September 28, 2006 and October 6,

2006, memorializing discussions from meetings on September 28 and October 5.[157]

Plaintiff also confirmed that during the PIP period he and Olsen met "[m]ore regularly

than normal."[158]

Based on the above, the court finds no evidence in the record to support

Sullivan's allegation that Olsen falsified information to indicate he and plaintiff were

meeting more often than usual.

Sullivan also contends that Olsen made misrepresentations concerning his

completion of tasks and omitted relevant information regarding the tasks he performed.

He alleges that Olsen's reports also misconstrued facts to make low priority issues out

to be critical in an effort to place Sullivan in an unfavorable light.

With regard to his allegation that Olsen misrepresented that he was not finishing

tasks and omitted relevant information regarding the tasks he had performed, Sullivan

cites his testimony concerning emails recounting coaching sessions from September

and October 2006.  In a September 28, 2006, Olsen outlined specific assignments he

had been given and deadlines for completion of certain of those assignments.  The

email concludes with Olsen's statement that:

---

[155] D.I. 42 at B-40.
[156] *Id.*
[157] D.I. 40, Exs. J, K.
[158] D.I. 42 at B-38.

> In general, I would like to reinforce our discussion that in addition to documentation and being able to demonstrate system and business knowledge, clear and concise communication is key to successful projects and working relationships.  Your Managers, both Resource and Project, as well as other team members involved must know if there are any issues that may impact your making any promised dates or delivering on any commitments.  Issues or conflicting priorities should be brought to the attention of the appropriate person as soon as they arise.[159]

There does not seem to be any statement that plaintiff did not complete any specific tasks in that email.  Indeed, in an October 6, 2006 email, Olsen affirmed that Sullivan *was* completing his assigned tasks stating that:

> The focus of our conversation yesterday centered around understanding why all the tasks and targets that we agreed upon during our coaching sessions were completed in a reasonable amount of time while previous to this many remained open on your active queue without any progress.  This concerned me as it creates a perception that you increase production when attention is brought to bear on your performance and causes me to wonder will production decrease if that attention is removed?  While trying to help me understand, you responded that in order to complete these requests it was necessary for you to work late hours and on weekends.  This is also of concern to me, as I do not believe that any of these tasks were particularly difficult or intensive and were assigned while keeping the rest of your responsibilities in mind.  This workload, for someone at your level and with a good knowledge of the system that they support, should have been accomplished within the normal working hours.[160]

Sullivan also testified that Olsen stated that the "IMAC was my only system responsibility."[161]  What Olsen actually wrote in the email was not that it was his only system responsibility, but that his "*primary* responsibility has been the support of the IMAC system . . ." and noted that assignments were made "while keeping the *rest of your responsibilities in mind.*"[162]  The record also confirms that the IMAC system had

[159] D.I. 40, Ex. J.
[160] *Id.*, Ex. K.
[161] D.I. 42 at B-42.
[162] D.I. 40, Ex. K (emphasis added).

been one of Sullivan's primary responsibilities even prior to Olsen becoming his

manager.  Olsen testified that the IMAC "system was his sole responsibility.  He was

what we call the subject matter expert or designated as the subject matter expert in that

system. . . .  When Barry joined my group, he had been working on that system for

some time. . . .  It was sometime prior to working for me."[163]  Sullivan's 2004

performance review, by Alessandrine, noted that "Barry works extensively on the EPA's

for the IMAC system" and that he was "primary support for the IMAC system . . .

spend[ing] a number of after-hours on the IMAC system due to system deficiencies."[164]

Sullivan's testimony also confirmed that he had worked on the IMAC system–at least to

some extent–for many years, even prior to Hearn becoming his manager,[165] and that by

the time Alessandrine was his manager one of his primary duties was support of the

IMAC system.[166]  Finally, Sullivan acknowledged that, at the time of the April IMAC

incident, he was the IT employee primarily responsible for supporting the IMAC

system.[167]

In the January 17, 2007 PIP report, one of the performance issues listed was

"Lack of demonstrated System/IT process knowledge."  Olsen reported that:

> A task was assigned to Barry in April 2006 to design a plan to reorganize
> all of IMAC VSAM files.  This is a standard IT process.  First design was
> presented on September 21, 2006.  The plan appeared to be overly
> complicated and not well designed.  When asked to explain how the

---

[163] D.I. 42 at B-59-B-60.

[164] *Id.* at B-95, B-101.

[165] *Id.* at B-16.

[166] *Id.* at B-17; *id.* at B-21 (Sullivan reiterating that he was responsible for supporting the IMAC system when Olsen became his manager).

[167] *Id.* at B-26 ("Q.  [At the time of the incident] [w]ere you the IT person responsible, primarily responsible at that point for supporting the IMAC system?  A.  You could say that.  Q.  And is that your understanding as to why this particular EPA was assigned to you?  A.  I believe so.").

> process was to function Barry was unable to explain how it worked.
> Several more versions were presented after that, none of which were
> acceptable.  At this time, there is not a plan ready to implement.[168]

Sullivan maintains that this was a misrepresentation, stating that he was not unable to

explain process functions but that Olsen, who had little understanding as to how the

systems worked, refused to accept his explanation.  Olsen acknowledged that he was

unable to increase Sullivan's knowledge of the system during their meetings because

he, Olsen, "had very little knowledge of the internal workings of that system," and "could

not coach him on specifics of the application itself."[169]  However, Olsen further

confirmed, as previously noted, that Sullivan's history with the system was extensive

and he operated as the "subject matter expert" of that system.[170]  Sullivan's own cited

testimony offers scant support for his contention that Olsen's recitation of the

assignment was a misrepresentation.  Although Sullivan stated he did not agree with

that recitation, he stated that "he puts it here as if nothing was done."[171]  To the contrary,

Olsen wrote that a "first design" was presented and that, at the time of the PIP report,

"there is not a plan ready to implement."  Sullivan does not dispute the substance of

those comments.  Sullivan also complains that the assignment was "low priority," "busy

work," and that "there was no target date for this to get done."[172]  He denied that he was

unable to explain how one of his design plans worked, insisting "I explained it wasn't the

---

[168] D.I. 40, Ex. M.
[169] D.I. 42 at B-59.
[170] *Id.*
[171] *Id.* at B-45.
[172] *Id.*  Although Sullivan argues that he did not agree with the prioritization of some of the tasks assigned to him he considered "busy work," he acknowledged that "he's the manager, that's what he wanted done, and I did that."  *Id.* at B-41.

way that he would like it done."[173]

The PIP report also included, under the issue of "Lack of implemented or presented improvements/enhancements," the following comment by Olsen:

> Though IMAC is Barry's primary system, little has been done to reduce the amount of involvement in maintaining the system.  Effective root cause analysis to permanently eliminate situations has not been demonstrated.  Corrective functions are still done manually by Barry.  When charged by his Manager to present to him at least one implementable plan to improve system performance, copies of pages from a user manual detailing functions that a user may perform were presented.[174]

In briefing, Sullivan does not directly contend that this is a misrepresentation, arguing instead that "Olsen refused to acknowledge the role a lack of training and support played and ignored larger, more critical issues highlighted by Plaintiff in favor of trivial matters that would not lead to resolution of issues."[175]  Plaintiff's testimony in support of that statement is that he disputed the accuracy of Olsen's statement.  His further testimony, however, listed the reasons why he was not able to implement or present improvements or enhancements, not that the task had been completed.[176]  Moreover, Sullivan did not dispute Olsen's statement that he gave Olsen copies of pages from a user manual detailing functions that a user may perform when asked about an implementable plan to improve system performance.[177]  Sullivan also initially testified that, under the heading "Continued lack of effective communication," Olsen's one-paragraph description of the three-day time line of communication concerning an

---

[173] *Id.* at B-45.
[174] D.I. 40, Ex. M.
[175] D.I. 42 at 13.
[176] *Id.* at B-46.
[177] *Id.* ("Q.  In response to that request, did you present him with copies of pages from a user manual?  A.  I presented him with some enhancements that could be done in the system, yes.").

assignment to create certain extract files was inaccurate.[178]

A careful examination of his supporting testimony, spanning approximately seven pages of deposition transcript, reveals that Sullivan does not directly challenge the substance of Olsen's description of the communication and progress of that assignment.  Instead, Sullivan testified that he was on vacation and working from home; that other employees were more familiar with the particular system at issue; that he also had other quarterly/year end responsibilities; and that he did not recall whether certain conversations occurred on the dates listed or whether he sent certain documentation to another associate to whom Olsen had reassigned a part of the task.[179]

Sullivan's testimony does not support a contention of misrepresentation by Olsen, rather, it presents purported reasons Sullivan was unable to accomplish the task and/or disagreement over the utility of the assignment.  Disagreeing with an employer's judgment, however, does not prove pretext.[180]  Moreover, the evidence does not support Sullivan's allegation that "Olsen refused to acknowledge the role a lack of training and support played" in his inability to improve the IMAC system.  As discussed above, Sullivan stated that there was no one available to provide the training he desired as

---

[178] *Id.*

[179] *Id.* at B-46-B-48.

[180] *Fuentes*, 32 F.3d at 765 (To prove pretext, plaintiff cannot "simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent."); *Massey v. U.S. Customs & Border Prot.*, No. Civ. 03-6590, 2004 WL 3019234, at *8 (E.D. Pa. Dec. 28, 2004) ("[T]he Third Circuit has consistently held that plaintiff's own perception of her abilities is not relevant in determining whether there is a genuine issue of fact of pretext for trial."); *Sylvester v. Unisys Corp.*, No. 97-7488, 1999 WL 167725, at *16 (E.D. Pa. Mar. 25, 1999) ("This court does not sit as an appellate personnel office in judgment on the wisdom of" an employer's decisions.) (citing *Simpson v. Kay Jewelers*, 142 F.3d 639, 647 (3d Cir. 1998)); *see also Rabinowitz v. AmeriGas Partners, L.P.*, 252 Fed. Appx. 524, 528 (3d Cir. 2007) ("[I]t is well-settled that a plaintiff may not defeat summary judgment merely by questioning the business judgment behind an employer's decision, absent other evidence of impermissible motives.") (Unpublished Opinion) (citing *Billet v. CIGNA Corp.*, 940 F.2d 812, 825-28 (3d Cir. 1991)).

those who might have had the necessary knowledge had left the company.  Olsen acknowledged that Sullivan did not have specific IMAC training as he testified that he was not unaware of any training available on the system Sullivan could have received. He expected Sullivan to increase his knowledge and skills "[b]y learning and doing" in the same way "anyone else on my team learned their systems . . . ."[181]

The court reiterates that Sullivan can not recall a single negative racial comment made by Olsen or by anyone else at Nationwide, or that he even heard of any such comment.[182]  Despite the evidence proffered by plaintiff, his testimony demonstrates that he has little more than his subjective belief that Olsen was motivated by race to terminate Sullivan.

> Q.  Is it your belief that [Olsen's] conduct toward you was because of your race?
>
> A.  I believe that in conclusion *I couldn't find anything other than my race* because no one other than me has suffered some of the ills that I was suffering.[183]

After describing Olsen yelling at him he was asked, "[d]o you know why Mr. Olsen acted that way toward you," to which he answered, "[a]t the time *I had no understanding of what it was that he was suffering from.*"[184]

When asked his opinion as to why Olsen put him on the PIP, Sullivan testified that:

> At this point, *I can only surmise that it was something personal and ethnic* since I was the only–I began strongly more so believing that his outrage and irrationality, his anger was directed toward something.  And the lack of

---

[181] D.I. 42 at B-59-B-60.
[182] *Id.* at B-24.
[183] *Id.* (emphasis added).
[184] *Id.* at B-23 (emphasis added).

communication on that subject and other subjects, that lead me to believe that *that was the only thing that made sense*. Nothing made sense any more, nothing was rational. A lot of this information was indicative to what either we talked about or what I accomplished. There was no discussion, almost no to little discussion, if any, about the accomplishments, what I did get accomplished, what hurdles I did overcome.[185]

Similarly, in response to the question of whether he believed Olsen was

harassing him because of his race, he responded:

I believe that *that was the only conclusion* I could come to. I was unable to get a definitive answer out of him whether or not it was race or personal, how it was racial or personal. So left the *assumption to me after awhile that there was nothing else left*, there was no other associates that were experiencing what I was experiencing.[186]

Even though Sullivan stated he could think of no other reason than his race for

Olsen's attitude toward him, he acknowledged he did not know that for sure:

Q: So at some point in your view [Olsen] began to discriminate against you and treat you differently than other people because of your race?

A. Yes.

Q. Did you have any explanation as to why that was?

A. Did I have any explanation?

Q. Yes.

A. To why–

Q. Why all of a sudden I started treating you differently than other people and started yelling at you, in your view, because of your race?

A. That's a question you have to ask him, why he treated me this way.

Q. I'm asking you, do you have an explanation for it?

---

[185] *Id.* at B-45 (emphasis added).
[186] *Id.* at B-44 (emphasis added).

A.  Again, that's a question that he would have to ask.  *I don't know what [was in] his mind.*[187]

Plaintiff needs more than his subjective belief to survive summary judgment and he has not presented any corroborating evidence.[188]

Based on the above, the court determines that Sullivan is unable to "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence."[189]   Unable to demonstrate that Nationwide's explanation for Sullivan's termination, poor work performance, was pretext for his termination, the court grants Nationwide's motion for summary judgment.

2.     Hostile Work Environment

---

[187] D.I. 40, Ex. A at 90-91 (emphasis added); Sullivan also testified that he directly "asked [Olsen] point blank something to do with my ethnicity or what, several times, what does this have to do with working?  Is this personal?  What did I do?  I asked several times to sit down and talk with him.  He either refused or looked at me with a blank face."  D.I. 40, Ex. A at 86.

[188] *See, e.g., Billet v. Cigna Corp.*, 940 F.2d 812, 816 (3d Cir.1991), *overruled in part on other grounds by St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993) (holding that the "[i]ndirect evidence must be enough to support a reasonable inference that the reasons given for the employment decision were pretextual.  Merely reciting that age was the reason for the decision does not make it so."); *Rizzo v. PPL Serv. Corp.*, No. Civ.A. 03-5779, 2005 WL 913091, at *11 (E.D. Pa. Apr. 19, 2005) (granting summary judgment where, *inter alia*, "the only basis for alleged age discrimination is the Plaintiffs' own unsubstantiated, subjective beliefs that 'no other explanation' is plausible"); *Frost v. PetSmart, Inc.*, Civ. A. No. 05-6759, 2007 WL 602990, at *5 (E.D. Pa. Feb. 26, 2007) ("[Plaintiff's] own unsubstantiated, subjective beliefs or suspicions alone would not suffice to persuade a rational trier of fact that age was a factor in the termination decision."); *Allen v. PetSmart, Inc.* 512 F. Supp. 2d 288, 293 (E.D. Pa. 2007) ("[Plaintiff's] own unsubstantiated, subjective beliefs or suspicions alone would not suffice to persuade a rational trier of fact that age was a factor in the termination decision."); *Martin v. Healthcare Bus. Res.*, No. 00-3244, 2002 WL 467749, at *6 (E.D. Pa. Mar. 26, 2002) ("Plaintiff's mere pronouncement or subjective belief that she was terminated because of her race, gender and age is not a substitute for competent evidence.") (citing *Pilgrim v. Trustees of Tufts College*, 118 F.3d 864, 871 (1st Cir.1997) and *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir.1996)); *see also Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990) ("We note than an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment.") (citing *Blackston v. Shook & Fletcher Insulation Co.*, 764 F.2d 1480, 1482 (11th Cir. 1985)); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460 (3d Cir. 1989) (non-movant cannot avoid summary judgment by "simply reassert[ing] factually unsupported allegations contained in its pleadings.").

[189] *Fuentes*, 32 F.3d at 765

44

To establish a hostile work environment claim, a plaintiff must show, "'by the totality of the circumstances, the existence of a hostile or abusive *environment* which is severe enough to affect the psychological stability of a minority employee.'"[190]  To establish a *prima facie* case of hostile work environment, a plaintiff must show that:  (1) he suffered intentional discrimination because of race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected him; (4) the discrimination would detrimentally affect a reasonable person of the same race in his position; and (5) the existence of vicarious liability.[191]

In determining whether the severe or pervasive element is satisfied, courts look to the totality of the circumstances, including such factors as the frequency of the conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance.[192]  Overt racial harassment is not necessary to establish a hostile environment.[193]  Plaintiff need only show that race played a substantial role in the harassment and that he would have been treated more favorably had he been white.[194] That said, courts in this circuit have frequently required at least some overt racially hostile words or conduct to signal the invidious nature of facially neutral conduct.[195]  An

---

[190] *Aman v. Cort Furniture Retail Corp.*, 85 F.3d 1074, 1081 (3d Cir. 1996) (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir. 1990)) (emphasis in original).

[191] *Aman*, 85 F.3d at 1081.

[192] *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *Nieves v. Acme Markets, Inc.*, 541 F. Supp. 2d 600, 606 (D. Del. 2008).

[193] *See Andrews*, 895 F.2d at 1485 (3d Cir. 1990).

[194] *Id.*

[195] *See Brooks v. CBS Radio, Inc.*, Civ. No. 07-0519, 2007 WL 4454312, at *11 (E.D. Pa. Dec. 17, 2007) (analyzing *Cardenas v. Massey*, 269 F.3d 251 (3d Cir. 2001) and *Caver v. City of Trenton*, 420 F.3d 243 (3d Cir. 2005)); *Santana v. State of Del. Dep't of Health &  Soc. Servs.*, Civ. No. 06-666 GMS, 2008 WL 399639, at *4 (D. Del. Feb. 13, 2008) (citing *Brooks* approvingly).

employee's subjective belief that he suffered severe or pervasive treatment, without more, is not enough to survive summary judgment.[196]  The Third Circuit has made clear, however, that the discrimination analysis "must concentrate not on individual incidents, but on the overall scenario."[197]

Sullivan argues that he was subjected to pervasive harassment, and claims Olsen's hostile treatment was unwarranted and solely directed toward him.  He also contends the record shows Olsen misrepresented issues with his work product as a pretext for discrimination.

Nationwide argues Sullivan has no evidence that he was subjected to severe or pervasive harassment or that he was discriminated against because of his race.  Consequently, Nationwide maintains Sullivan has failed to establish a *prima facie* case of hostile work environment.

Based on the evidence detailed in the section above, the court agrees with Nationwide.  Sullivan can point to no overt racially hostile words or conduct by Olsen.  Sullivan testified that he did not know whether Olsen yelled at his white co-workers as he was not privy to conversations Olsen might have had with those employees.  The evidence does not support the allegation that Olsen constantly yelled at him.  In addition to only reporting to Hughes two dates when Olsen yelled at him, the evidence from

---

[196] *See Douglas v. United Serv. Auto Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996); *see also McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 436-37 (3d Cir. 2007) ("[T]o survive summary judgment, a party must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue.") (quoting *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005)); *In re Phillips Petroleum Sec. Litig.*, 881 F.2d 1236, 1243 (3d Cir. 1989) ("[P]laintiff may not simply rest upon his bare allegations . . . rather, he must present 'significant probative evidence tending to support the complaint.'") (quoting *Anderson*, 477 U.S. at 249).
[197] *Andrews*, 895 F.2d at 1484.

46

Hughes' interviews with his co-workers contradicts his assertions as they had never witnessed any manager or co-worker behaving in the manner Sullivan described. To the extent that Olsen did raise his voice at Sullivan, the record demonstrates that those interactions were related to Sullivan's work performance. Because the evidence does not support Sullivan's allegations of falsifying or misrepresenting Sullivan's performance issues, he is left with only his subjective belief that Olsen's treatment of him was racially motivated.

Consequently, Sullivan has failed to establish that he suffered intentional discrimination *because of race* or that the purported discrimination was severe or pervasive. Because Sullivan has failed to establish a *prima facie* claim for hostile work environment, Nationwide's motion for summary judgment is granted.

3.    Pay Disparity

Sullivan contends he "suffered discrimination with regard to the payment of wages in that he was paid significantly less than white co-workers."[198]

In 2004, Olsen became the manager of five employees, including Sullivan, who held the position of Senior Developer, IT Applications. Sullivan's four co-workers were all white. Three of those individuals made higher salaries than Sullivan, while the fourth earned less.[199] Sullivan contends that Nationwide has proffered no legitimate evidence to support this disparity and its reasoning is a mere pretext for Olsen's discriminatory

---

[198] D.I. 1, ¶ 21.

[199] D.I. 40, Ex. W. As of March 28, 2007, the three higher paid employees earned between $6,779.58-$7,487.19 more than plaintiff. This amount of higher pay included raises those employees received in March 2007. As explained below, because plaintiff was on a PIP in March 2007, he was ineligible to receive a raise at that point per Nationwide policy. The fourth of Sullivan's co-employees earned $112.19 less than he did.

47

behavior.  Sullivan argues that Olsen regularly presented higher-ups with false information intended to place Sullivan's job performance in a negative light which purportedly hindered Sullivan's compensation.

The court determines there is insufficient evidence to support Sullivan's allegation of discriminatory disparate pay.  First, Sullivan's testimony confirms that Olsen is the only individual at Nationwide whom he alleges racially discriminated against him:

> Q.  Of all of the managers that you had during the period of time you worked for Nationwide, the only one that you're accusing of racial discrimination is Ken Olsen; correct?
>
> A. Yes, I believe that he has some issues.
>
> Q. And there are no other managers or supervisors that you reported to while you worked at Nationwide who you believe treated you less favorably than other employees because of your race; right?
>
> A. I believe that's accurate.[200]

Plaintiff's testimony concerning the compensation of IT employees managed by Olsen merely reflects his subjective belief as to why his compensation was at the level it was.  With regard to the alleged pay disparity, Sullivan testified as follows:

> Q. Is it your understanding that Olsen made decisions with respect to how much to pay Kuchak, O'Flaherty and you?
>
> A. I don't know what his objective was. I know that what I wasn't getting, and it didn't appear to be on the equal, same equal plain that the other, as the other associates were getting in salary or training.[201]

---

[200] *Id.*, Ex. A at 213; *see also id.*, Ex. A at 212-13 (Sullivan testifying that he did not believe former managers Williams, Hearn, or Alessandrine treated him less favorably than his white co-workers because of his race).

[201] D.I. 40, Ex. A at 210.  Defendant also cites the following testimony from Sullivan regarding his wages.  "[A.] I believe that during that time with Mr. Olsen and how I was being treated and how my peers were being treated, it seemed to be some unfairness, if you will, there, and I suspect that, along with some

He testified further that:

> Q.  Any other reason for you to believe that your compensation was
> negatively affected because of race discrimination other than what you've
> already said about Kuchak and O'Flaherty?
>
> A. Other than there was no other rational reason why I wouldn't get
> bonuses or promotions or training to increase my salary other than the fact
> that they were Caucasian.  I did the same work that they did, supported
> the same systems that they did.[202]

The record indicates, however, that although he was paid less than three of his

co-workers, that pay disparity existed prior to Olsen becoming his manager.  Moreover,

after Olsen became Sullivan's supervisor, his compensation increased at a higher

percentage rate than any of his higher paid co-workers.[203]  From the time Olsen became

Sullivan's supervisor in late 2004 until his termination, Sullivan's salary increased twice.

As of March 29, 2004, plaintiff's annual salary was $65,463.60.  In 2005, after Olsen

became Sullivan's manager, he received a raise of $1,309.27 increasing his salary to

$66,772.87.  In 2006, Sullivan received another raise, of $1,001.59, for a total salary of

$67,774.46.[204]

Three other employees on plaintiff's team who held the same position as plaintiff

were paid higher annual salaries comparatively.  Two of those three employees did not

receive any salary increase in 2005 or 2006; the third did not receive a raise in 2005 but

---

personal issues, that there was some unequal pay or unfair pay going on as well.  [Q.]  And the personal
issues are the personal issues between you and Olsen?  A.  Well, not me and Olsen.  With Olsen."  D.I. 39
at 17-18 (citing Sullivan Depo. at 206:16-207:1) (emphasis added by defendant).  Those pages of
Sullivan's transcript are not included in defendant's exhibits, although the court notes that plaintiff does not
dispute the accuracy of that transcription.

[202] D.I. 40, Ex. A at 211.  Sullivan also testified that he did not have any knowledge of what
Kuchak or O'Flaherty were paid when they first joined the company.  *Id.*

[203] The court notes that the record does not indicate that testimony was elicited from Olsen
regarding the salary/raise decisions he made with respect to the IT employees he managed.

[204] *Id.*, Ex. X at ¶ 3  (Declaration of Jevarra N. Foster).  Sullivan's 2005 raise was approximately
2% and his 2006 raise was approximately 1.5%.

49

did receive a raise in 2006.  As of March 29, 2004, employee number 35222 received an annual salary of $73,426.00.  That employee did not receive a raise in either 2005 or 2006.[205]  As of March 29, 2004, employee number 352446 earned $73,426.00 per year and, also, received no salary increase in 2005 or 2006.[206]  Employee number 352160 earned $72,725.00 as of March 29, 2004; received no raise in 2005; and, in 2006, received a raise of $1,090.88 increasing his salary to $73,815.88.[207]  Thus, during 2005 and 2006:  Sullivan's salary increased at an annual rate of 1.75%; the salary of employee number 352160 increased at the annual rate of 0.75%; and the salaries of employee numbers 352222 and 352446 did not increase at all.[208]  Furthermore, two of the three IT employees who earned more than Sullivan were hired nearly six and nine years before Sullivan.[209]  Although the other higher-paid employee was hired over eight years after plaintiff,[210] the fourth employee, who earned less than Sullivan, worked at Nationwide almost sixteen years longer.[211]

Consequently, the court determines there is no evidence supporting plaintiff's

---

[205] *Id.*, Ex. X at ¶ 6.

[206] *Id.*, Ex. X at ¶ 7.

[207] *Id.*, Ex. X at ¶ 5.  This employee's 2006 raise was an increase in his salary of 1.5%.  In addition to the fact that employees 352222 and 352446 received no raises in 2005 and 2006, the fact that the 2006 raises received by employee number 352160 and Sullivan were each 1.5% of the their base salary is contrary to plaintiff's contention that Olsen misrepresented plaintiff's performance to superiors to hinder his earnings potential.

[208] *Id.*, Ex. X at ¶ 8.  Each of these employees received additional raises on March 26, 2007.  Because plaintiff had been placed on a PIP, he was ineligible for a raise on that date and was terminated two days later on March 28, 2007.  *Id.*, Ex. X at ¶ 9; *see also id.*, Ex. L (Nationwide Employee Handbook, § 12.  Attendance, Performance & Behavioral Issues stating that "[y]ou are not eligible to apply for internal jobs, receive salary increases or promotions while on Performance Improvement"); *id.*, Ex. M (January 17, 2007 PIP advising of ineligibility for internal transfer, raises, and promotion during the PIP period).

[209] *Id.*, Ex. W (Sullivan was hired January 4, 1988.  The two other employees were hired April 12, 1982 and March 26, 1979, respectively.).

[210] *Id.*, Ex. W (listing October 28, 1996 as this employee's date of hire).

[211] *Id.*, Ex. W (listing September 11, 1972 as this employee's date of hire).

claim of pay disparity based on racial discrimination.[212]  During Olsen's tenure as Sullivan's manager, he received two salary increases, which constituted a larger percentage of his base salary over the 2005-2006 time period than the increase the one higher paid employee received; the two other higher paid employees received no increases at all those years.  The disparity of Sullivan's base pay relative to those three employees existed prior to Olsen becoming his manager.  That disparity would have been the result of decisions made by Sullivan's prior managers, who Sullivan testified did not discriminate against him.  Therefore, defendant's motion for summary judgment on plaintiff's pay disparity claim is granted.

## C.  Retaliation

Sullivan contends he was terminated as a direct result of his complaining of Olsen's discriminatory treatment and resulting hostile work environment.  Reiterating his argument with regard to the discriminatory termination claim, he argues Nationwide's attempt to proffer a non-discriminatory motive for termination is a pretext intended to obscure the discriminatory attitude, conduct, and actions of Olsen toward him.  This claim is subject to a burden-shifting inquiry similar to that propounded in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[213]  The initial burden in this inquiry rests with plaintiff to establish a *prima facie* case of retaliation by showing that:  (1) he

---

[212] Although not necessary for the court's determination, it notes that three other Sr. Developer/ IT Applications employees working at the same Nationwide location as plaintiff also earned less than Sullivan.  Two of those employees were white and the third was listed as "Asian/Pacific Islander."  *Id.*, Ex. W.  While these three employees were supervised by a manager other than Olsen, plaintiff did not respond to Nationwide's argument that their lower compensation demonstrates that Sullivan's salary was in the middle of the salary range of all Nationwide employees having the same position and, thus, there was no pay disparity at all.

[213] *Schatzman v. Martin Newark Dealership, Inc.*, 158 F. Supp. 2d. 392, 402 (D. Del. 2001).

engaged in a protected activity; (2) defendant took a materially adverse employment action against him after or contemporaneous with the employee's protected activity; and (3) there is a causal connection between his participation in the protected activity and the defendant's adverse action.[214]  A materially adverse action is one that "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination."[215]  A causal connection between protected activity and adverse action may be inferred from:  (1) an unusually suggestive temporal proximity between the two; (2) an intervening pattern of antagonism following the protected conduct; or (3) the proffered evidence examined as a whole.[216]

If plaintiff establishes a *prima facie* case, the burden shifts to defendant to advance a legitimate, non-retaliatory reason for its action.[217]  The burden at this stage is relatively light.  It is satisfied if defendant articulates any legitimate reason; it need not prove that the articulated reason actually motivated the action.[218]  If Nationwide provides such a reason, the burden returns to Sullivan to show pretext, *i.e.*, some evidence from which a fact finder could reasonably (1) disbelieve Nationwide's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of Nationwide's action.[219]  This again requires Sullivan to demonstrate "such weaknesses, implausibilities, inconsistencies,

---

[214] *See Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 320 (3d Cir. 2008) (citing *Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006)).

[215] *Burlington N. & Sante Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

[216] *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997).

[217] *See Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997) (citing *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 n.2 (3d Cir. 1997)).

[218] *See Woodson*, 109 F.3d at 920 n.2 (3d Cir. 1997) (citing *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)).

[219] *See Fuentes*, 32 F.3d at 764.

incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."[220]

Sullivan argues he engaged in a protected activity (his complaint about Olsen's behavior) and he suffered an adverse employment action (his termination).  Conversely, Nationwide contends Sullivan cannot establish a *prima facie* case of retaliatory discrimination because there is no causal connection between Sullivan's alleged protected activity and his termination.  Even if such connection were shown, Nationwide argues that Sullivan cannot show that Nationwide's legitimate, non-retaliatory reasons for his termination were pretextual.

The court has determined, in the first section above, that Nationwide's proffered reason for Sullivan's termination, poor work performance, was not pretextual.  Sullivan's retaliation claim, therefore, fails and the court need not delve into Nationwide's contention that there was no causal connection between Sullivan's allegedly protected activity and his termination.  Consequently, Nationwide's motion for summary judgment on Sullivan's retaliation claim is granted.

## D.  Breach of the Implied Covenant of Good Faith and Fair Dealing

Count III of the complaint alleges a breach of the covenant of good faith and fair dealing as a result of "Olsen, . . . falsifying information regarding Plaintiff's job performance and relaying that information to senior management and to human resources representatives in an attempt to secure Plaintiff's termination . . . ."[221]

---

[220] *Id.* at 765 (citing *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir.1992)) (internal quotations omitted).
[221] D.I. 1, ¶ 33.

Nationwide sets forth two arguments in favor of its motion for summary judgment on this claim.  First, Nationwide argues that the "Delaware Discrimination in Employment Act . . . precludes" such a claim.[222]  Nationwide contends that Sullivan's breach of the covenant of good faith and fair dealing claim merely recasts his race discrimination claims and, therefore, fails as a matter of law.

Second, Nationwide contends that Sullivan can advance no evidence of the falsification or manipulation of records necessary to establish his good faith and fair dealing claim.

> In Delaware, [the covenant of good faith and fair dealing] is breached when the employer misrepresents a material fact upon which the employee relies in deciding to accept a new position, *when the employer falsifies or manipulates the records to create false grounds for discharge*, when the employer abuses its superior bargaining position to deprive the employee of compensation or where the termination would violate public policy.[223]

Nationwide contends that plaintiff's allegation that Olsen falsified "information regarding Plaintiff's job performance . . . in an attempt to secure Plaintiff's termination" is without factual support.

Sullivan acknowledges that if his claim for breach of the covenant of good faith and fair dealing were grounded solely on racial discrimination, it must be considered under the Delaware Discrimination in Employment Act.  He argues, however, that this claim is not race dependent.  Sullivan avers that this claim is based on the purported bad faith actions of Olsen regarding falsifying and manipulating his performance reviews

---

[222] D.I. 39 at 21 (citing *Moon v. Del. River & Bay Auth.*, No. Civ. A. 05-261-JJF, 2006 WL 462551, at *4 (D. Del. Feb. 24, 2006)).

[223] *Conneen v. MBNA Am. Bank, N.A.*, 182 F. Supp. 2d 370, 381-82 (D. Del. 2002), *aff'd.*, 334 F.3d 318 (3d Cir. 2003) (emphasis added).

54

to create false grounds for termination.  Sullivan maintains that Delaware law recognizes a cause of action for breach of the covenant of good faith and fair dealing when an employer falsifies or manipulates an employee's records to create false grounds for discharge.[224]  Sullivan contends that following the April 2006 IMAC incident, Olsen prepared performance reviews containing misrepresentations and falsities intended to create fictitious grounds for his discharge.  Sullivan also contends Olsen misrepresented the frequency of his meetings with him, misrepresented that he was not finishing tasks, omitted relevant information regarding the tasks performed, distorted facts to place plaintiff in an unfavorable light and refused to acknowledge the role denial of training and support to him played in the matter.

The court notes, again, that each of these allegations was addressed and dismissed in the first section of this order.  Because the court found that these allegations were not supported by the evidence, Nationwide's motion for summary judgment on Sullivan's claim for breach of the covenant of good faith and fair dealing is granted.

## IV.  CONCLUSION

For the reasons contained herein, IT IS ORDERED, ADJUDGED and DECREED that:

    1.  Defendant's Motion for Summary Judgment (D.I. 38) is **GRANTED**.

---

[224] D.I. 42 at 23 (citing *Reed v. Agilent Techs., Inc.*, 174 F. Supp. 2d 176, 191 (D. Del. 2001)).

July 6, 2010
Wilmington, Delaware

_____
UNITED STATES MAGISTRATE JUDGE